## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| GREG PALAST and HELEN BUTLER, | ] | |
| | ] | |
| Plaintiffs | ] | CIVIL ACTION FILE |
| | ] | NO. _____ |
| V | ] | |
| | ] | |
| BRIAN KEMP, in his official capacity | ] | |
| As Secretary of State of the State of | ] | |
| Georgia, | ] | |
| | ] | |
| Defendant. | ] | |

## COMPLAINT

Plaintiffs Greg Palast and Helen Butler by and through counsel, respectfully file this Complaint seeking full compliance with their request for information to the defendant Secretary of State under the public disclosure provisions of the National Voter Registration Act.  Plaintiffs complain on information and belief as follows:

## INTRODUCTION

1. In 1993, the United States Congress passed the National Voter Registration Act. 52 U.S.C.  § 20501. (NVRA).

2. This Act was passed based on the following Congressional findings:

    **(1)** the right of citizens of the United States to vote is a fundamental right;
    **(2)** it is the duty of the Federal, State, and local governments to promote the exercise of that right; and

1

(3)  discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

3.     The purposes of the NVRA act are consistent with these findings and are:

(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
(2) to make it possible for Federal, State, and local governments to implement this Act in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
(3) to protect the integrity of the electoral process; and
(4) to ensure that accurate and current voter registration rolls are maintained.

4. Based on the above Congressional findings and stated the purposes of the NVRA states are required to eliminate barriers to citizens exercising their fundamental right to vote. The NVRA puts affirmative duties on state and local governments to increase the number of eligible voters. One minor purpose of the law is to maintain current and accurate voter registration rolls. However the requirements and duties to increase participation and remove barriers have been subordinated to many states' attempts to purge their voter rolls, sometimes of groups or individuals who those in power do not want to see exercise the franchise.  That is, rather than promoting voter registration and eliminating unfair discriminatory practices, many States and local governments have embraced voter roll purging, and allowed voter roll maintenance to eclipse and undermine the ameliorative findings and

purposes of the NVRA.    In the process, many states, including Georgia under the direction of Defendant Kemp, do not ensure that the voter registration rolls are current or accurate.   In fact they cancel the registrations of people who do not change their residences when such cancellations are prohibited by the NVRA. This results in the reduction of reducing the number of eligible citizens who are registered to vote.

5. Congress determined that in order to ensure that any list maintenance activities are implemented in a non-discriminatory manner consistent with the purposes and findings of the NVRA the process of maintenance must be transparent to the public,  52 U. S. C. §20507 (i) requires:

> **(1)** Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.
>
> **(2)**  The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

6. This case arises out of Plaintiffs' concerns that Georgia's list maintenance programs were being implemented in a discriminatory manner in part because the State of Georgia participates in the Interstate Voter Crosscheck

program, which has been determined to disproportionately adversely impact voters of color.  Thus, to determine if the list maintenance efforts by the State of Georgia have been implemented in a non-discriminatory fashion, Plaintiffs requested the information under these public disclosure provisions of the NVRA.

7. The information was first requested of the Elections Division of the Secretary of State's office through the Georgia Open Records Act. However the response was not satisfactory as it required Plaintiffs pay for the time of employees to redact the records requested.  Plaintiffs therefore followed up with a 90-day notice under the public disclosure provisions of the NVRA to produce the information in order to prevent litigation.

8. As will be set forth more fully herein, Plaintiffs allege that defendant Secretary of State Kemp has violated the public disclosure provisions of the NVRA by failing to fully provide the information requested by Plaintiffs. Furthermore, Georgia waited until almost the close to the end of the 90-day notice period to provide partial information which actually shows hundreds of thousands of people's voter registrations were cancelled based on the claim they had moved when they in fact had not moved.  By this case Plaintiffs seek full disclosure of the information requested in order to fully

determine whether there the public disclosure provisions of the NVRA have been violated.

9. Plaintiffs also believe obtaining this information is necessary to address Plaintiffs' concerns that the procedures used by Defendant to purge the voter rolls and Defendant are not uniform and discriminatory.

## **PARTIES**

10. Plaintiff Greg Palast is a resident of Los Angeles California.  He is an internationally known investigative journalist who has reported seminal stories on racially-biased vote purges for *The Guardian, Harper's, and BBC Television*. For the last five years, Plaintiff Palast produced award-winning exposés on voter purges in Georgia for Al Jazeera and *Rolling Stone*.  He is the Director of the Palast Investigative Fund, a non-partisan not-for-profit foundation project supporting complex investigative journalism.

11. Plaintiff Helen Butler is a resident of Atlanta Georgia.  She is a long-time acclaimed activist for civil and human rights.  She serves as the Executive Director of the Georgia Coalition for the Peoples' Agenda.  This Coalition is based in Atlanta and is active throughout the State of Georgia and leads election protection activities.   The Coalition also helps to build state coalitions in the Southeast states of Alabama, Mississippi, Louisiana, Florida, South Carolina, North Carolina, Tennessee and Kentucky.

12. Defendant Brian Kemp is the Secretary of State of the State of Georgia.  He is being sued in his official capacity.  Secretary Kemp's responsibilities under O.C.G.A. § § 21-2-50(a)(14), 21-2-211 include maintaining the State's official list of registered voters and preparing and furnishing information for voters regarding registering and voting. His simultaneous role as Chair of the State Elections Board involves him in decisions regarding rules and regulations promulgated by the Board to ensure uniformity of practices within the State in the conduct of primary and general elections.  O.C.G.A. § § 21-2-30(d) 21-2-31(1)-(2).  Defendant Kemp is also the chief election official responsible for the coordination of Georgia's voter list maintenance activities pursuant to the NVRA and the Help America Vote Act of 2002 (HAVA).  Defendant Kemp is currently a candidate for the Governor of the State of Georgia.

## JURISDICTION AND VENUE

13. This case arises under the National Voter Registration Act 52 U.S. C. §20501 *et. seq*.  This Act grants Plaintiffs a private right of action to enforce its provisions under 52 U.S.C.  §20510(b).  The Court has subject matter jurisdiction therefore under 28 U.S.C. §1331 and 28 U.S.C. §1343(a).  The Court has personal jurisdiction over defendant as he is a citizen of Georgia.

Venue is proper in this District pursuant to 28 U.S.C. §1391 as the actions

complained of occurred in this District.

## FACTUAL ALLEGATIONS

**Background of this case is in the Crosscheck System**

14. As an investigative reporter, Plaintiff Palast has been interested in many

issues related to voter suppression.  One of the issues which caught his

attention was the Interstate Voter Crosscheck System. (Hereinafter

"Crosscheck")

15. Crosscheck began in 2005 and initially involved only four states, including

Kansas, Iowa, Missouri and Nebraska.  The purpose was to share data to

see whether anyone in these states may have "voted twice" and, in

addition, to provide notice to member states of voters who had allegedly

moved to another state

16. Under Kansas Secretary Kris Kobach the program expanded.  In 2010,

thirteen states participated.  By 2014, twenty-nine States participated.  In

2017, Crosscheck analyzed 98 million voter registration records from 28

states and returned 7.2 million "potential duplicate registrant" records to

member states.

17. Crosscheck relies on only two points of data for matching: name and date of

birth.  Other data is shown for each voter, but the matches are made only on

the basis of first and last name, ignoring, for example, mismatched middle names.

18. These matching points have a built-in racial bias, with people of color being improperly targeted.  This is because people of color are over-represented in 85 of the 100 most common surnames.

19. It is not known how many people were purged from the voting rolls nationally before the 2016 elections due to Crosscheck.

20. Beginning in 2014, Plaintiff Palast and his team at the Palast Investigative Fund began investigating the issue of voter purges due to Crosscheck, as well as voter roll purges in general, in all the Crosscheck-participating states, including Georgia.

**Initial Information Request**

21. On March 2, 2018, a demand for a list of records under the Georgia Open Records Act was sent to the Secretary of State Elections Division at email address openrecords@sos.ga.gov from undersigned counsel Mirer on behalf of Plaintiff Palast.   The letter also informed the Records Custodian that the information requested was "required to be made publicly available under Section 8 of the National Voter Registration Act (NVRA), 52 U.S.C. §20501 *et seq*, which provides that all elections offices make available for at least

two years "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i).

22. The letter also referred to the requesters concerns about Georgia's use of Crosscheck given the racial impact referenced above.

23. The letter stressed the "paramount importance that the public be granted access to information regarding the states' use of Crosscheck data to purge voters from their rolls" and requested the following information:

   a. The list of names, addresses, races, and birthdates of voters in Georgia who were identified as having been potentially registered in one of the other participating Interstate Voter Registration Crosscheck states in 2016 and 2017.  The undersigned are seeking **original copies of the list provided by Crosscheck to the Elections Division** showing the name, address, race, and birthdate of the voter with whom each Georgia voter was matched from another participating Crosscheck State.

   b. Whether, given the above-described unreliability and the racially-disparate impact of the data provided by Crosscheck to its member states, Georgia intends to continue its participation in the Crosscheck program in 2018, either by providing state voter data to the program or by any other means.

   c. The standard procedure followed by the Elections Division in response to receipt of the lists described in requests 1-2: Whether voters identified by the Crosscheck program are purged from voting rolls, placed on inactive status, or any other action, as well as the requirements for having voting rights restored once such an action has been effectuated.

d.  The list of persons who were sent letters requesting verification of addresses in 2016 and/or 2017.

e.  Samples of cards requesting verification of address sent to the people listed in request number 6.

f.  The list of names and addresses of all those purged or changed to inactive in 2016 and/or 2017 and the basis for each individual being removed from the voter rolls, most notably those who were removed due to their names being matched with out-of-state voters through the Crosscheck program.

g.  The names and addresses of all persons who attempted to vote in any 2016 and/or 2017 election and were prevented from doing so by virtue of their names being purged or made inactive.

h.  The list of all persons who voted by provisional ballot in any election in 2016 and/or 2017.

24. The response did not provide the records but referred to the cost associated with retrieving the records and redacting them, and required a confirmation that the costs would be paid before the office would begin to retrieve and redact the requested records.

**90-day NVRA Notice:**

25. This response from Georgia, as well as other States that claimed similar and other barriers to providing un-redacted complete records, led Plaintiffs to rethink their requests under State-level Open Records Acts.

26. Plaintiffs decided to pursue this information under the NVRA disclosure provisions alone.

27. On June 12, 2018, Plaintiffs Palast and Butler sent a notice to Defendant and asked for the following information as most relevant to their inquiry at that time:

    a.  The list of names, addresses, and birthdates, and dates of registration of voters in Georgia who were identified as being potentially registered in one of the other participating Interstate Voter Registration Crosscheck states in 2016 and 2017. I am seeking **original copies of the list provided by Crosscheck to the Elections Division** showing the name, address, birth date, and registration date of the voter with whom each Georgia voter was matched from another participating Crosscheck State. Please provide this information in an electronically-readable format, such as Microsoft

    b.  The list of names and addresses of all those purged or changed to inactive in 2016 and/or 2017 and the basis for each individual being removed from the voter rolls, most notably those who were removed due to their names being matched with out-of-state voters through

the Crosscheck program. Please provide this information in an electronically-readable format, such as Microsoft Excel.

28. No response to this letter was received by mid-August, at which time Plaintiffs sent a reminder letter on August 14, 2018 that the 90 days would expire on September 10, 2018.

29. On September 4, 2018, Defendant Kemp provided a partial response to the NVRA request for documents. The partial response included the 2016 and 2017 registration cancellation lists, and the 2016 and 2017 lists of those voters changed from active to inactive.  The response denied Plaintiff's requests for the 2016 and 2017 Crosscheck lists, however, claiming that Georgia did not use Crosscheck data for voter list maintenance purposes.

30. The lists of voters cancelled or made inactive which was provided along with a reason for either the cancellation or inactivation.  The data shows which voters' records were run through a systematic process in the Secretary of State's office, which were entered by an official at the County level (user action) and those who have been identified as deceased (Vital Process).

31. Results of this analysis is depicted in the charts below:

## 2016 Cancellations by Reason

| Status Reason | Removal Process | | Grand Total |
|---|---|---|---|
| | System | Vital Process | |
| Deceased | 19,684 | 37,363 | 57,047 |
| Duplicate | 9,329 | - | 9,329 |
| Error | 639 | - | 639 |
| Felon | 10,702 | - | 10,702 |
| Hearing | 358 | - | 358 |
| Mentally Incompetent | 11 | - | 11 |
| Moved Out of County | 502 | - | 502 |
| Moved Out of State | 3,626 | - | 3,626 |
| Not Verified | 258 | - | 258 |
| Voter Requested | 847 | - | 847 |
| **Grand Total** | **45,956** | **37,363** | **83,319** |

## 2017 Cancellations by Reason

| Status Reason | Removal Process | | | Grand Total |
|---|---|---|---|---|
| | System | User Action | Vital Process | |
| Deceased | - | 24,224 | 40,222 | 64,446 |
| Duplicate | - | 36,623 | - | 36,623 |
| Error | 2 | 281 | - | 283 |
| Felon | - | 14,021 | - | 14,021 |
| Hearing | 31 | 574 | - | 605 |
| Mentally Incompetent | - | 21 | - | 21 |
| Moved Out of County | 22 | 784 | - | 806 |
| Moved Out of State | 10 | 11,621 | - | 11,631 |
| No Activity For 2 Genl Election Cycles | *534,510* | 7 | - | 534,517 |
| Not Verified | 8 | 514 | - | 522 |
| Voter Requested | 1 | 2,201 | - | 2,202 |
| **Grand Total** | 534,584 | 90,871 | 40,222 | **665,677** |

### 2016 Inactives

| Status Reason | SYSTEM | USER ACTION | Grand Total |
|---|---|---|---|
| Returned Mail | 2 | 3,941 | 3,943 |
| Grand Total | 2 | 3,941 | 3,943 |

### 2017 Inactives

| Status Reason | SYSTEM | USER ACTION | Grand Total |
|---|---|---|---|
| NCOA | 116 | 101,755 | 101,871 |
| Returned Mail | 194 | 43,490 | 43,684 |
| Grand Total | 310 | 145,245 | 145,555 |

32. Plaintiffs were shocked when they saw that over a half a million Georgians had their registrations automatically cancelled through the inactivity process utilized by the Georgia Secretary of State.

33. Under this process, denoted in O.C.G.A. §§ 21-2-234 and 21-2-235, voters who have not voted or made contact with any elections offices in the state of Georgia over a period of three years are mailed a notice at the address corresponding to their voter registration information, asking them to confirm within 30 days whether they still live at that address. If elections officials receive no response at the expiration of 30 days, the voter is moved to an "inactive list". If they fail to make contact with elections officials – either by voting in any election or any other form of contact – over another two general elections, their voter registration is cancelled. In 2017, Georgia cancelled the registrations of 534,517 voters following this process, a number equivalent 1 in 12 Georgia registrants.

34. The confirmation process described above is based on NVRA's allowance for voter removals if the State discovers the voter has changed his/her residence.   A voter cannot be removed solely on the basis of not voting. 52 U.S.C.  § 20507(b)(2)

35. According to Defendant the failure to return the notice suggests that the voter may have moved. This makes them inactive and automatically removes them from the rolls if they do not vote in two subsequent general elections.

36. Plaintiffs, therefore, endeavored to determine whether those 534,517 individuals cancelled in 2017 for missing 2 general elections were indeed no longer living at the address that existed on their original registration.

37. It took some time to find an expert service to analyze this data. Eventually Plaintiff Palast found a service to do the verification.

38. The service received a file of 555,702 voter registration records, which comprised the relevant portions of both the 2016 and 2017 cancelled voter lists originating from the State of Georgia. These records excluded voters cancelled for being deceased, for being convicted felons, those adjudged mentally incompetent, and other standard conditions that disqualify voters. The service then read and corrected address fields, parsing them into street

address, city, state, and zip code, as the State of Georgia had not provided them in a usable standard address format.

39. From that process, 458,556 were further processed through postal "hygiene" routines including address standardization, zip code correction, NCOA (National Change of Address) and PCOA (Proprietary Change of Address) databases. Out of these processes, the service delivered output that included assessment of mail deliverability and verification of a named individual at an address.

40. The process outlined above is considered by professional data analysts to be the standard of reasonable proof for determining whether an individual does in fact reside at a particular address.

41. On October 2, 2018, before the process of verifying addresses could be completed Plaintiff Palast and many civil rights leaders including the leadership of the Southern Christian Leadership Conference, Rainbow/PUSH Coalition, Atlanta NAACP, the New Georgia Project and others held a press conference in Atlanta to publicize the magnitude of the cancellations.

42. The analysis of the data performed by the service on the cancellation list showed at least[1] 340,134 Georgians of the 555,702 Georgians whose registrations were cancelled (or 61%) still lived at the address where they lived when they registered to vote. In other words, 61% of voters cancelled for supposedly moving are more likely than not still living precisely where they lived before the inactive-to-cancel process was started against them.



**Lack of Crosscheck Data**

43. Further, Plaintiffs were and remain concerned that Crosscheck has been used to identify voters who possibly moved particularly given that list's built in racial bias.  Plaintiffs are, therefore, seeking the full disclosure of the information requested including the 2016 and 2017 Crosscheck lists.

---

[1] Plaintiffs say "at least" 340,134 because, due to data formatting problems, only 458,556 of the original 555,702 records could be sent through the verification process. The inclusion of the excluded 96,000 records could only have increased the numbers of voters erroneously cancelled from Georgia's rolls, likely increasing the percentage of the 555,702 people whose registrations were cancelled and who have not moved.

44. Defendant Kemp's resistance to producing the Crosscheck lists and description of the Georgia Crosscheck operation is inconsistent with the prior response of his office. In contrast to Defendant's position at present, in 2014 in response to an Open Records request and informal requests by Plaintiff Palast, Secretary Kemp's office gave a member of Plaintiff Palast's investigation team the entire 2013 Crosscheck list, description of its operation and the address confirmation cards used in the program. It was the Georgia Crosscheck list provided by defendant Kemp's office that produced the data showing that the Crosscheck program is both highly inaccurate and racially biased.

45. Plaintiff thus performed a comparative data analysis of the 2013 Crosscheck list and the 2016/2017 cancelled voters list.

46. This analysis showed that of the 534,517 Georgia voters cancelled for No Activity for two General Election Cycles, at least 106,435 of those voters were also on the 2013 Crosscheck list.

## 2013 Crosscheck Matches to 2016/2017 Cancellations

| Status Reason | 2016 Cancels | 2017 Cancels | Grand Total |
|---|---|---|---|
| Duplicate | 35 | 119 | 154 |
| Error | | 2 | 2 |
| Felon | 246 | 220 | 466 |
| Hearing | 26 | 55 | 81 |
| Mentally Incompetent | 2 | | 2 |
| Moved Out of County | 41 | 48 | 89 |
| Moved Out of State | 449 | 1,350 | 1,799 |
| No Activity For 2 General Election Cycles | | 106,435 | 106,435 |
| Not Verified | 5 | 13 | 18 |
| Voter Requested | 70 | 156 | 226 |
| **Grand Total** | 874 | 108,398 | **109,272** |

## Posting this Data on the Gregpalast.com website

47. These analyses of the cancellation data to took time due to the size of the data files. The complete analyses were not complete until on or about October 4, 2018.

48. Due to the fact that 340,134 of 555,702 people whose registrations had been cancelled for allegedly having moved still lived at the address reflected on their registrations,  and the fact that these persons did not know their registrations were cancelled, Plaintiff Palast decided to put the list of all those purged on his website, www.gregpalast.com, to let people know about their status and give them the opportunity to re-register before the October 9, 2018 deadline.

49. The names were loaded into the website by October 7, 2018.

50. Word spread as soon as the "purge list" was posted, and the website was immediately inundated with people checking for their names.

51. In the short time between the posting of the purge list and the close of registration, at midnight on October 9, 2018, over 100,000 people visited the website.

52. The website gave people information about how to reregister if they found their name on the list. It also gave people the opportunity to contact Plaintiff Palast to share their information.

53. Over 1,000 people requested information from Plaintiff Palast, which was provided to them in a return email in less than two days.

54. Even if all 100,000 people who visited Plaintiff Palast's website had their registrations cancelled and were subsequently able to re-register, there are still likely almost a quarter of a million previously registered voters who may want to vote in this election who will find their registrations cancelled based on an assumption that they had moved when they had not.

55. This is a travesty for the people of Georgia whose fundamental right to vote has been taken without any formal notice that their registrations have been cancelled.

56. The failure of the State of Georgia and defendant to ensure all who want to vote can vote undermines the democratic process.

57. The data also shows because at least 340,134 people whose registrations are cancelled have not moved, the voter rolls in the State of Georgia have become more inaccurate and not current as required by the NVRA. Contrary to the purposes of the NVRA the voting rolls have not expanded but likely contracted by almost a quarter million people who would otherwise be eligible to vote on November 6, 2018.

**Failure of Georgia to provide complete information under the NVRA Request**

58. As noted above, 106,435 of the 534,510 Georgians who had their registrations cancelled because they allegedly had moved were also on the 2013 Crosscheck list.

59. Plaintiffs had requested in their June 12, 2018 information request the basis for people having their registrations cancelled.

60. Purging of voters from the voting rolls based on missing two election cycles is an indication that Georgia was implementing O.C.G.A. § 21-2-234, noted above.

61. In light of Plaintiffs' request for the basis for the cancellations, Plaintiffs sought the confirmation notices which would have gone out in 2013.

62. Plaintiffs have been in touch with Secretary of State Kemp's General Counsel Ryan Germany about the confirmation notices and the 2016 and 2017 Crosscheck lists.  Mr. Germany has said he would send out the confirmation notices from 2013-2014 but they have not been received as of yet.

63. As to the Crosscheck lists Mr. Germany stated in his October 4, 2018 letter responding to requests for the Crosscheck lists: "Georgia does not and has not ever used Crosscheck data for any list maintenance of any voter registration purpose, whatsoever."

64. This unequivocal statement is contradicted by Mr. Kemp's predecessor Karen Handel, who in a video interview with Plaintiff Palast when she was running for Congress in the special election in 2017 said: "We used Crosscheck to make sure illegal voters were not on our rolls."   Plaintiff Palast asked if any illegal voters were ever found and she replied affirmatively.

65. In addition, in 2014, in providing the list to the Palast Investigative Fund team, defendant Kemp's then Deputy held a discussion of the way Georgia took action based on the Crosscheck lists obtained from Secretary Kobach of Kansas.

66. Furthermore, the official website of Interstate Crosscheck and presentations to the national association of Secretaries of State show Georgia as participating in Crosscheck in every year from 2013 through 2017.

67. At least one person who was on the 2013 Crosscheck list contacted Plaintiff Palast and told him that he voted in 2008 and 2012 for President Obama, but his voter registration was cancelled.  The voter was on the 2013 Crosscheck list obtained from Defendant Kemp.  This voter's registration could not have been cancelled using the procedure which requires a voter to have no contact for three years, fail to return a confirmation post-card, and then fail to vote in another two elections.  As this registrant voted in 2008 and 2012, the only reasonable conclusion is that the voter was sent a confirmation postcard only because he appeared on the 2013 Crosscheck list.

68. One possible explanation for this is that Georgia is using the Crosscheck data as a proxy for believing a person has moved to another state so as to trigger the sending of a confirmation notice.

69. Mr. Germany further stated that, while both the 2016 and 2017 Crosscheck lists were provided to Georgia, the State undertook no action with them and he was thus unable to locate either list. He was asked by undersigned counsel Mirer to ask for the lists back from Kansas.  On October 11, 2018, Mr.

Germany verbally informed undersigned counsel Mirer that they would not do that and would not turn over these lists.

70. In addition, Defendant Kemp redacted the middle names of voters purged. It is well known from Plaintiff Palast's report in *Rolling Stone* magazine and other outlets that one of the major flaws of Crosscheck is that the list, and the Georgia list specifically, "matched" voters even though they have different middle names. Specifically, the 2013 Georgia Crosscheck list provided by Defendant to Plaintiff Palast includes over 100,000 Georgia voters who supposedly moved out of Georgia—because a voter with their first and last name was located in another state – although in each state, the Georgian was matched with a voter with a different middle name. For example, Gary Anthony Jackson of Georgia was supposed to be the same voter as Gary Lee Jackson Jr. of Illinois. On information and belief, Defendant's redacting the middle names of voters purged in 2017 is a method of concealing the possible role of Crosscheck in identifying voters who have allegedly left the state.

71. Over the five years of investigative reports published and broadcast by Plaintiff Palast on Crosscheck, seen locally, nationally and internationally, at no time until in response to Plaintiffs' request for Crosscheck lists did defendant's office aver that it did not use Crosscheck for list maintenance.

72. Based on the foregoing there is reason to suspect Georgia is using Crosscheck data for voter registration list maintenance, to identify those who may have moved from the state, triggering the sending of a postcard in 2013 or 2014, thus leading to the cancellation of the voter's registration in 2017 if the voter missed two elections. Without access to the full information requested, it is impossible to audit if and how Crosscheck is used or misused in list maintenance in the past or the future.

73. Getting lists of voters whose names match voters in other states for comparison purposes is a program or activity conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, (even if that includes maintenance of lists of other Crosscheck States) and thus is a record that is subject to public disclosure under the NVRA. 52 U.S.C. § 20507(i) mandates the provision of these lists for a period of two years, which entitles Plaintiffs to the Crosscheck lists from 2016 and 2017.

74. Also because the NVRA requires that any activity to ensure the maintenance of an accurate and current voter registration roll must be uniform, non-discriminatory and in compliance with the Voting Rights Act, if the Crosscheck list has been used to identify voters who may have possibly moved, Georgia will not be acting in a way that is uniform or nondiscriminatory.

75. Because Defendant Kemp has not fully complied with Plaintiffs' requests for information under the NVRA, he has violated Plaintiff's rights to full information under the NVRA. Plaintiff's accordingly seek an order requiring Defendant Kemp to turn over these Crosscheck lists forthwith so that Plaintiff's may determine if Defendants have engaged in discriminatory or arbitrary conduct under the NVRA which has eliminated the voting rights of hundreds of thousands of Georgian citizen.

## COUNT I
## VIOLATION OF PUBLIC DISCLOSURE PROVISIONS OF THE NVRA

76. Plaintiffs repeat and re-allege each of the allegations contained in this complaint as if fully stated herein.

77. Based on the foregoing, by failure to provide full response to Plaintiffs' request for public disclosure of the Crosscheck lists as stated above, the Defendant has violated the NVRA public disclosure provisions after being given 90 days' notice.

78. Pursuant to 52 U.S.C. § 20510 (b)(2) Plaintiffs bring this action to seek full compliance with their information requests stated above.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court enter judgement

A. Finding that the Defendant Kemp has violated the public disclosure provisions of the NVRA as stated in the complaint,

B. Order Defendant Kemp to provide the 2016 and 2017 Crosscheck lists with full names of those on the lists to Plaintiffs, and

C. Award Plaintiffs their costs and expenses and attorneys' fees as provided by law.

D. Grant any other relief as the Court deems just and proper.


Respectfully submitted,



S/ G. BRIAN SPEARS
GA Bar # 670112
Attorney for Plaintiffs

1126 Ponce de Leon Ave.
Atlanta, GA 30306
(404) 872-7086
bspears@mindspring.com

Jeanne Mirer
NY Bar # 4546677
Attorney for Plaintiffs
Pro Hac Application pending

Mirer, Mazzocchi & Julien PLLC
150 Broadway, 12th Floor
New York, NY 10038
(212) 231 2235