## DECLARATION UNDER PENALTY OF PERJURY
## OF RYAN GERMANY

1.     I am over the age of majority, of sound mind, and otherwise qualified to make this Declaration based upon my own personal knowledge. This Declaration is offered pursuant to 28 U.S.C. § 1746 in support of Georgia Secretary of State Brad Raffensperger's ("Defendant" or "Secretary") Motion for Summary Judgment (Defendant's "Motion").

2.     On or about January 14, 2013, the Georgia Secretary of State executed a Memorandum of Understanding ("MOU") with the chief election officials of 19 other states to share voter registration data between the various states (the "Crosscheck Program"). A true and correct copy of the MOU is attached hereto as **Exhibit A**.

3.     Pursuant to the MOU, Georgia agreed to provide its voter registration rolls to the office of the Kansas Secretary of State to compare with those of other states and search for duplicate entries.

4.     Georgia's participation in the Crosscheck Program was limited to providing voter registration data to the Kansas Secretary of State; however Georgia no longer sends voter registration information to Crosscheck and has not done so since January 2017. Georgia does not use and has never used the information generated by the Kansas Secretary of State to challenge or remove registrations from the Georgia voter registration database or for any list maintenance purpose whatsoever, including sending confirmation notices.

5.     On or about January 23, 2013, the Georgia Secretary of State submitted the MOU for preclearance under Section 5 of the Voting Rights Act of 1965, as amended (42 U.S.C. § 1973). A true and correct copy of this preclearance check submission is attached as **Exhibit B**.

6.    Georgia's submission of the MOU for preclearance under Section 5 of the VRA was made out of an abundance of caution, as the Secretary's provision of voter registration data pursuant to the MOU does not affect Georgia's own voter registration system or voters in any way. (*See* **Exhibit B** at 2.)

7.    On or about February 28, 2013, the U.S. Department of Justice determined that preclearance under Section 5 was unnecessary as Georgia's participation in the Crosscheck Program does not affect voting in the State of Georgia. A true and correct copy of the Department of Justice's decision is attached hereto as **Exhibit C**.

8.    On or about June 12, 2018, counsel for Plaintiffs submitted a request to the Georgia Secretary of State's office under the National Voter Registration Act, 52 U.S.C. § 20507, requesting the 2016 and 2017 reports produced by the Kansas Secretary of State comparing the Georgia voter registration roll to other participating states for the purpose of identifying potential duplicate voters (the "Crosscheck Lists"). Plaintiffs also requested a list of all individuals removed "or changed to inactive" in Georgia's voter rolls in 2016 and/or 2017. A true and correct copy of Plaintiffs' Counsel's June 12, 2018 letter is attached hereto as **Exhibit D**.

9.    On or about September 5, 2018, the Georgia Secretary of State's office responded to Plaintiffs' June 12, 2018 letter and confirmed that "Georgia has not used data or matches received from the [ ] Crosscheck Program to remove or otherwise change the status of voter registrations.  To date, [Georgia's] involvement has been limited to including our data in the [ ] Crosscheck Program.  [Georgia] did not participate at all this year (2018)." A list of voters cancelled or changed to inactive status was also provided pursuant to Plaintiffs' secondary request. A true and correct copy of the

Secretary of State's September 5, 2018 letter is attached hereto as **Exhibit E**.

10.     On or about September 27, 2018, counsel for Plaintiffs sent an additional letter again requesting copies of the 2016 and 2017 Crosscheck Lists, as well as making several new requests for documents. A true and correct copy of Plaintiffs' Counsel's September 27, 2018 letter is attached hereto as **Exhibit F.**

11.     On or about October 4, 2018, the Georgia Secretary of State's office responded to Plaintiffs' September 27, 2018 letter and reiterated that "Georgia does not use and has not ever used Crosscheck data for list maintenance or any voter registration purpose whatsoever" and thus was "under no obligation to retain that data pursuant to the NVRA." The Secretary of State's office further confirmed that "[w]e have performed a diligent search to ensure that we do not have the 2016 and 2017 lists provided by the Crosscheck program, and we do not have them." A true and correct copy of the Secretary of State's October 4, 2018 letter is attached hereto as **Exhibit G.**

12.     On or about October 8, 2018, counsel for Plaintiffs sent a third letter to the Georgia Secretary of State's office again requesting the 2016 and 2017 Crosscheck Lists despite the Georgia Secretary of State's office's confirmation that it did not possess them.  A true and correct copy of Plaintiffs' Counsel's October 8, 2018 letter is attached hereto as **Exhibit H.**

13.     After receiving Plaintiff's request for the 2016 and 2017 Crosscheck Lists, the Georgia Secretary of State's office checked its files to see if any copies of either of the lists remained in any form. That search confirmed that the office does not, in fact, possess the Crosscheck Lists sought by Plaintiffs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my ability.

Executed on 5/8/19    .

C. Ryan Germany

General Counsel
Georgia Secretary of State

# Exhibit A

# MEMORANDUM OF UNDERSTANDING

## For Interstate Voter Registration Data Comparison

### January 2013

This Memorandum of Understanding is made between the chief state election officials respectively of the States of Arizona, Arkansas, Colorado, Georgia, Illinois, Iowa, Kansas, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Nebraska, Ohio, Oklahoma, Oregon, South Dakota, Tennessee, Texas and Virginia.

WHEREAS, the States through the offices of the chief state election officials and under the authority of the respective state laws have each separately implemented a variety of changes to election processes as required by Public Law 107-252, the Help America Vote Act of 2002, among these changes being the implementation of a centralized, interactive, computerized statewide voter registration list, and;

WHEREAS, the existence of centralized, interactive, computerized statewide voter registration lists facilitates the interoperability of such lists for the purpose of comparison and cross checking of registration records, and;

WHEREAS, the chief state election officials of the respective States desire to enter into this Memorandum of Understanding to set forth the terms of an agreement between the respective officers, on behalf of their respective States, to establish between them and between the States a process for each State to improve the accuracy of each State's voter registration list;

NOW, THEREFORE, the undersigned chief state election officials, in exchange for the mutual promises and commitments contained in this Memorandum of Understanding, do hereby agree as follows:

1. The States agree to share voter registration information for the purposes of cross checking and identifying duplicate registrations and instances of multiple votes by the same individuals.

2. The process of cross checking will be as follows:
   a. Each State will send a file containing voter registration data to the Kansas Secretary of State's office in a format and on a schedule to be determined by mutual agreement, with the intention of conducting a cross check at minimum once per year.
   b. Each participating State's list will be compared to the lists from the other participating States.
   c. The Kansas Secretary of State will return the results of the data cross check to each participating State. The data will include the State possessing the matching record, any information about such voter provided by said State, and the date the voter registered in said State.
   d. Potential duplicate records will be identified when the first names, last names and dates of birth match.

e. All data will be transferred to and from the Kansas Secretary of State using industry standard encryption technology and passwords.

f. All original data will be securely destroyed upon completion of the project.

3. The Kansas Secretary of State shall maintain procedures and controls acceptable to other participating states for the purpose of assuring that information in its possession is not mishandled, misused, released, disclosed, or used in an inappropriate manner by it, its agents, officers, or employees. All parties to this agreement shall take all reasonable steps and precautions to safeguard this information and shall not divulge the information to parties other than those needed for the performance of duties under the agreement. Information transferred under this agreement shall be used only for the purposes identified in the agreement.

4. Notwithstanding aggregate usage statistics used for reporting purposes, and subject to the Kansas Open Records Act, the Kansas Secretary of State shall keep confidential all information concerning individual registrants. The Kansas Secretary of State shall not, under any conditions, resell, transfer or convey information about registrants to any third party.

5. Each chief state election official shall designate such staff from his or her respective office as may be deemed necessary to carry out the terms of the Memorandum of Understanding.

6. This Memorandum of Understanding may be joined by additional States by signature of the chief state election officer in each such State without prior approval of the original participating states.

**SIGNED ON BEHALF OF THEIR RESPECTIVE STATE BY:**

Hon. Brian P. Kemp
Georgia Secretary of State

1 - 7 - 2012
Date

# Exhibit B



**GEORGIA DEPARTMENT OF LAW**
**40 CAPITOL SQUARE SW**
**ATLANTA, GA 30334-1300**

SAMUEL S. OLENS
ATTORNEY GENERAL

www.law.ga.gov
(404) 656-3300

January 23, 2013

## BY FACSIMILE (202.616.9514) DELIVERY

### SUBMISSION UNDER SECTION 5
### OF THE VOTING RIGHTS ACT

T. Christian Herren, Esq.
Chief, Voting Section
Civil Rights Division
Room 7254 – NWB
Department of Justice
1800 G. Street, N.W.
Washington, D.C. 20006

Re: Georgia Sec. 5 Submission 2013-02: Submission of Memorandum of
Understanding For Interstate Voter Registration Data Comparison.

Dear Mr. Herren:

As the the chief legal officer of the State of Georgia, I hereby submit for preclearance, pursuant
to Section 5 of the Voting Rights Act of 1965, as amended (42 U.S.C. § 1973c), the
Memorandum of Understanding providing for the sharing of voter registration data between the
Secretary of State of Georgia and his counterparts in Arizona, Arkansas, Colorado, Illinois, Iowa,
Kansas, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Nebraska, Ohio, Oklahoma,
Oregon, South Dakota, Tennessee, Texas and Virginia. The execution of the Memorandum of
Understanding does not change any voting standard, practice or procedure with either the
purpose or effect of abridging the right to vote on account or race, color or membership in a
minority group. 28 C.F.R. § 51.52(a).

In accordance with the required contents for submission set forth in 28 C.F.R. § 51.27, the State
of Georgia hereby submits the following information with respect to this request.

(a)     A copy of any ordinance, enactment, order, or regulation embodying a change
        affecting voting.

        There is no change in any Georgia registration provisions as a part of this
        Memorandum. Instead, this submission is in relation to the execution of a

Memorandum of Understanding between the Georgia Secretary of State and the appropriate chief election officials of 19 other states which provides for the sharing of voter registration data between the various states. The submission is made out of an abundance of caution, but the providing of this data to other states will not affect Georgia's voter registration system or its voters in any way. A copy of the Memorandum is attached as **Exhibit A**.

(b)  A copy of any ordinance, enactment, order, or regulation embodying the voting practice that is proposed to be repealed, amended, or otherwise changed.

As noted above, this Memorandum does not change any existing statutory provision in relation to Georgia's election process. The Memorandum is executed pursuant to the Secretary of State's authority outlined in O.C.G.A. § 21-2-225(b), which permits the sharing of voter registration data with the governments of the other states and the United States.

(c)  If the change affecting voting either is not readily apparent on the face of the documents provided under paragraphs (a) and (b) of this section or is not embodied in a document, a clear statement of the change explaining the difference between the submitted materials adequate to disclose to the Attorney General the difference between the prior and proposed situation with respect to voting.

As noted above, O.C.G.A. § 21-2-225(b) provides that the Secretary of State of Georgia may make available to other states and to the federal government voter registration information "relating to the dates of birth, social security numbers, and driver's license numbers of electors." The Secretary is now implementing that authority in executing this data sharing agreement between Georgia and Arizona, Arkansas, Colorado, Illinois, Iowa, Kansas, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Nebraska, Ohio, Oklahoma, Oregon, South Dakota, Tennessee, Texas and Virginia.

The Memorandum provides that each of the signatory states will send its voter registration database to the office of the Kansas Secretary of State at least once a year. The Kansas Secretary of State will then compare the various databases, searching for duplicate entries by comparing first and last names and dates of birth and searching for exact matches. The results will then be reported back to Georgia and the other states. The agreement also provides for the data to be securely maintained by the Kansas Secretary of State.

Georgia is not using the information provided by the Kansas Secretary of State to either challenge or remove registrations and the data will not be provided to county voter registrars. The sole purpose of Georgia's participation in the program is to increase the universe of registrant's names in the database for

comparison purposes by the other states. Those states may then determine whether they need to undertake any registration actions.

(d) The name, title, address and telephone number of the person making the submission.

Honorable Samuel S. Olens
Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
404.656.3300

Please direct all communications to:

Dennis R. Dunn
Deputy Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
404.656.5614

(e) The name of the submitting authority and the name of the jurisdiction responsible for the change, if different.

The submitting authority is the Georgia Attorney General, who is the chief legal officer of the State of Georgia. The submission is made on behalf of the Secretary of State of Georgia who acts as the election superintendent for state office elections.

(f) If the submission is not from a state or county, the name of the county and State in which the submitting authority is located.

Not applicable.

(g) Identification of the person or body responsible for making the change and the mode of decision (e.g., act of state legislature, ordinance of city council, administrative decision by registrar).

The submission is made on behalf of the Secretary of State of Georgia.

(h) A statement identifying the statutory or other authority under which the jurisdiction undertakes the change and a description of the procedures the jurisdiction was required to following in deciding to undertake the change.

As noted above, the Secretary of State is authorized to undertake this action pursuant to O.C.G.A. § 21-2-225(b).

(i) The date of the adoption of the change affecting voting.

The Secretary executed the agreement on January 14, 2013.

(j) The date on which the change is to take effect.

The Memorandum became effective on the signature of the Secretary of State.

(k) A statement that the change has not yet been enforced or administered, or an explanation why such a statement cannot be made.

As noted above, the Memorandum of Understanding provides for Georgia to provide registration information to the Kansas Secretary of State for data comparison purposes and possibly for use by other states in relation to registrations. Georgia is not taking any action in relation to Georgia's registered voters in relation to the Memorandum.

(l) Where the change will affect less than the entire jurisdiction, an explanation of the scope of the change.

The change will affect the entire State of Georgia.

(m) A statement of the reasons for the change.

*See* Paragraph (c) above.

(n) A statement of the anticipated effect of the change on members of racial or language minority groups.

The execution of this Memorandum is not anticipated to affect members of racial or language minority groups.

(o) A statement identifying any past or pending litigation concerning the change or related voting practices.

To the best of my knowledge, there is no past or pending litigation regarding the call for this practice.

(p) A statement that the prior practice has been precleared (with the date) or is not subject to the preclearance requirement and a statement that the procedure of the adoption of the change has been precleared (with the date) or is not subject to the

preclearance requirement, or an explanation of why such statements cannot be made.

The amendment to O.C.G.A. § 21-2-225(b), which provides the authority for the Secretary's actions, was submitted to the U.S. Attorney General under DOJ File No. 2009-2117. The Attorney General concluded in a letter dated September 2, 2009, that the change did not require preclearance, but noted that the Act was enabling in nature so that future implementation of the provisions might still need Section 5. This submission is made out of abundance of caution and in accordance with that determination.

The State does note that the Attorney General has apparently previously reviewed this same Memorandum in relation to the State of Louisiana and that it was precleared by letter dated July 9, 2010, under DOJ File No. 2010-2324.

(q)    For redistricting and annexations: the items listed under § 51.28(a)(1) and (b)(1); for annexations only, the items listed under § 51.28(c)(3).

Not applicable.

(r)    Other information that the Attorney General determines is required for an evaluation of the purpose or effect of the change.

None.

Pursuant to 28 C.F.R. § 51.28, the following additional information is submitted.

(a)    Demographic information.

None.

(b)    Maps.

None

(c)    Annexations.

Not applicable.

(d)    Election returns.

Not applicable.

(e)    Language usage.

To the best of my knowledge, the action does not affect the use of the language of a minority group in the elective process.

(f)   Publicity and participation.

This Memorandum has not been subject to any particular publicity or public participation.

(g)   Availability of the submission.

The submission will be available for public review at the office of the Secretary of State's Election's Division.

(h)   Minority group contacts.

Minority members of the General Assembly who may be familiar with the underlying statute include the following:

Hon. Lester G. Jackson
Senator, District 2
110-D State Capitol
Atlanta, GA 30334
404.463.5261

Hon. Alisha Thomas Morgan
Representative, District 39
404 Legislative Office Building
Atlanta, GA 30334
404.656.0109

Hon. Gloria S. Butler
Senator, District 55
420-C State Capitol
Atlanta, GA 30334
404.656.0075

Hon. Howard Mosby
Representative, District 83
607 Legislative Office Building
Atlanta, GA 30334
404.656.0287

There is no further information that is known to be relevant to the consideration of this submission.

Sincerely,

SAMUEL S. OLENS
Attorney General

SSO/DRD

# MEMORANDUM OF UNDERSTANDING

## For Interstate Voter Registration Data Comparison

### January 2013

This Memorandum of Understanding is made between the chief state election officials respectively of the States of Arizona, Arkansas, Colorado, Georgia, Illinois, Iowa, Kansas, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Nebraska, Ohio, Oklahoma, Oregon, South Dakota, Tennessee, Texas and Virginia.

WHEREAS, the States through the offices of the chief state election officials and under the authority of the respective state laws have each separately implemented a variety of changes to election processes as required by Public Law 107-252, the Help America Vote Act of 2002, among these changes being the implementation of a centralized, interactive, computerized statewide voter registration list, and;

WHEREAS, the existence of centralized, interactive, computerized statewide voter registration lists facilitates the interoperability of such lists for the purpose of comparison and cross checking of registration records, and;

WHEREAS, the chief state election officials of the respective States desire to enter into this Memorandum of Understanding to set forth the terms of an agreement between the respective officers, on behalf of their respective States, to establish between them and between the States a process for each State to improve the accuracy of each State's voter registration list;

NOW, THEREFORE, the undersigned chief state election officials, in exchange for the mutual promises and commitments contained in this Memorandum of Understanding, do hereby agree as follows:

1. The States agree to share voter registration information for the purposes of cross checking and identifying duplicate registrations and instances of multiple votes by the same individuals.

2. The process of cross checking will be as follows:
   a. Each State will send a file containing voter registration data to the Kansas Secretary of State's office in a format and on a schedule to be determined by mutual agreement, with the intention of conducting a cross check at minimum once per year.
   b. Each participating State's list will be compared to the lists from the other participating States.
   c. The Kansas Secretary of State will return the results of the data cross check to each participating State. The data will include the State possessing the matching record, any information about such voter provided by said State, and the date the voter registered in said State.
   d. Potential duplicate records will be identified when the first names, last names and dates of birth match.

e. All data will be transferred to and from the Kansas Secretary of State using industry standard encryption technology and passwords.

f. All original data will be securely destroyed upon completion of the project.

3. The Kansas Secretary of State shall maintain procedures and controls acceptable to other participating states for the purpose of assuring that information in its possession is not mishandled, misused, released, disclosed, or used in an inappropriate manner by it, its agents, officers, or employees. All parties to this agreement shall take all reasonable steps and precautions to safeguard this information and shall not divulge the information to parties other than those needed for the performance of duties under the agreement. Information transferred under this agreement shall be used only for the purposes identified in the agreement.

4. Notwithstanding aggregate usage statistics used for reporting purposes, and subject to the Kansas Open Records Act, the Kansas Secretary of State shall keep confidential all information concerning individual registrants. The Kansas Secretary of State shall not, under any conditions, resell, transfer or convey information about registrants to any third party.

5. Each chief state election official shall designate such staff from his or her respective office as may be deemed necessary to carry out the terms of the Memorandum of Understanding.

6. This Memorandum of Understanding may be joined by additional States by signature of the chief state election officer in each such State without prior approval of the original participating states.

**SIGNED ON BEHALF OF THEIR RESPECTIVE STATE BY:**

Hon. Brian P. Kemp
Georgia Secretary of State

1 - 14 - 2013
Date

# Exhibit C



**U.S. Department of Justice**

Civil Rights Division

TCH:RSB:JR:TAL:par
DJ 166-012-3
2013-0184

*Voting Section - NWB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

February 28, 2013

Dennis R. Dunn, Esq.
Deputy Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334-1300

Dear Mr. Dunn:

This refers to the sharing of voter registration data with specified states pursuant to the January 2013 Memorandum of Understanding for the State of Georgia, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c. We received your submission on January 23, 2013.

Our analysis indicates that the submitted change does not affect voting and, therefore, is not subject to the preclearance requirement of Section 5. Accordingly, no determination by the Attorney General is required or appropriate under Section 5. Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, 28 C.F.R. 51.2, 51.12, 51.13, and 51.35.

Sincerely,

T. Christian Herren, Jr.
Chief, Voting Section

# Exhibit D

# MIRER MAZZOCCHI & JULIEN PLLC

ATTORNEYS AT LAW
150 BROADWAY, TWELFTH FLOOR
NEW YORK, NEW YORK 10038

JEANNE MIRER            KRISTINA MAZZOCCHI            RIA JULIEN

TELEPHONE: (212) 231-2235
FACSIMILE: (212) 409-8338

EMAIL: info@mmsjlaw.com
INTERNET: www.mmsjlaw.com

June 12, 2018

Secretary of State Brian Kemp
2 MLK Jr. Drive
Suite 802 Floyd West Tower
Atlanta, Georgia 30334
soscontact@sos.ga.gov

Dear Secretary Kemp,

I am addressing you in your capacity as Secretary of State, and therefore the chief elections official of Georgia under O.C.G.A. §21-2-210, on behalf of Helen Butler, Executive Director of the Georgia Coalition of the People's Agenda, and Greg Palast, a reporter covering voter suppression issues with Rolling Stone Magazine, Trouthout.com, and the Palast Investigative Fund. Pursuant to Section 8 of the National Voter Registration Act, 52 U.S.C. §20507, I am requesting on their behalf access to records concerning Georgia's participation in the Interstate Voter Registration Crosscheck program. These records fall under the public disclosure provisions of the NVRA, since they concern registered voter list maintenance. Public access to information regarding how voter rolls are maintained, and the systems for removing individuals from those lists, are central components of the NVRA, which was passed in 1993 to better protect the right to vote - a right so fundamental that "other rights, even the most basic, are illusory if the right to vote is undermined" *Gallivan v. Walker,* 54 P. 3d 1069, 1081 (S. Ct. UT 2002).

**My request is not made pursuant to the Georgia Open Records Act.**

1

I submitted a request under the Georgia Open Records Act several months ago and have yet to receive either the records or a denial of such from Georgia election officials. As you well know, O.C.G.A. §50-18-71(b)(1)(A) requires a response no later than three (3) business days following the request, providing the requested records or a detailed explanation of the denial. While such a delay places Georgia elections officials out of compliance with the state's own public records statute, Georgia is furthermore out of compliance with the federally-mandated provisions of the NVRA, which explicitly state that the information I have requested be made publicly available.

I am giving you 90 days' notice of Georgia's failure to provide the requested records under the NVRA, pursuant to 52 U.S.C. §20510(b). If these records are not produced within the notice period, I will be forced to file a lawsuit to remedy the violation. 52 U.S.C. § 20510(c) provides for the possible award of attorney fees, including litigation expenses and costs, to private parties.

## I.      My requests under the NVRA.

On behalf of Helen Butler, Executive Director of the Georgia Coalition of the People's Agenda, and journalist Greg Palast, I am requesting the following documents:

1. The list of names, addresses, and birthdates, and dates of registration of voters in Georgia who were identified as being potentially registered in one of the other participating Interstate Voter Registration Crosscheck states in 2016 and 2017. I am seeking **original copies of the list provided by Crosscheck to the Elections Division** showing the name, address, birth date, and registration date of the voter with whom each Georgia voter was matched from another participating Crosscheck State. Please provide this information in an electronically-readable format, such as Microsoft Excel.

2. The list of names and addresses of all those purged or changed to inactive in 2016 and/or 2017 and the basis for each individual being removed from the voter rolls, most notably those who were removed due to their names being matched with out-of-state voters through the Crosscheck program. Please provide this information in an electronically-readable format, such as Microsoft Excel.

## II.     Georgia's responsibilities under Section 8 of the NVRA.

Section 8 of the NVRA requires that activities undertaken by the state to maintain the accuracy of lists of registered voters be made available to the public:

*Public Disclosure of Voter Registration Activities.*

(1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

(2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made. 52 U.S.C. §20507(i)

The 1993 National Voter Registration Act was passed with an explicit mandate to all levels of government to expand and protect the voting rights of American citizens. "The Congress finds that-- (1) the right of citizens of the United States to vote is a fundamental right; (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right" (52 U.S.C. §20501). To that end, the exceptions listed above in Section 8 are intentionally narrow, excluding only:

1) Records related to a declination to register to vote, or
2) The identity of a voter registration agency through which any particular voter is registered. 52 U.S.C. §20507(i)(1)

It follows, therefore, that all other records related to programs and activities conducted to ensure the accuracy and currency of official lists of eligible voters *not* sheltered by these narrow exceptions be provided to the public pursuant to Section 8.

Since the NVRA's passage, Courts have consistently affirmed this broad reading of Section 8. "This language embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies." *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331, 334-35 (4th Cir. 2012) (holding that Virginia election officials were mandated under §20507 to disclose completed voter registration applications). "Public access to a broad scope of information that shows how a State makes voter eligibility determinations furthers these goals." *Project Vote v. Kemp,* 208 F. Supp. 3d 1320, 1336 (N.D. Ga 2016) (holding that electronic records were properly considered in the scope of Section 8's disclosure requirements).

### III.    Crosscheck is a voter registration list maintenance program.

Since 2013, the State of Georgia has been a member of the Interstate Voter Registration Crosscheck program, which is run by Kansas Secretary of State Kris Kobach with the purported goal of assisting states in administration of their voter lists, in particular updating lists to ensure currency. Once a year, Crosscheck collects the lists of registered voters from participating states, and then uses a simple matching formula – alarmingly simple – to identify potential matched voters between states, using only a few data points. In the majority of cases, voters are matched by only three points: first name, last name, and birth date.

Crosscheck has repeatedly come under criticism for the inaccuracy of the data it provides to participating states. (See Ingraham, *This Anti-Voter-Fraud Program Gets it Wrong Over 99 Percent of the Time. The GOP Wants to Take It Nationwide*, The Washington Post, July 20, 2017). Several states, including Florida, Oregon, and Washington, opted into Crosscheck only to withdraw after receiving unreliable data, and other states have indicated they intend to do the same (Kruesi, *Idaho to Reevaluate Participating in Voter "Crosscheck" Program*, Associated Press, November 14, 2017). Crosscheck's methods also disproportionately target voters of color: Statistical analysis found that the name-matching procedure results in higher incidence of false positives connecting two distinct minority voters who share a common last name, since minorities are overrepresented in 85 of the 100 most common U.S. last names (see Greg Palast, *The GOP's Stealth War on Voters*, Rolling Stone, August 24, 2016).

Crosscheck is precisely the kind of maintenance program Congress had in mind when it created the public disclosure provisions of the NVRA. Due to the potential for legitimate voters to be erroneously removed from the registered voter lists as a result of Crosscheck data – and the egregious impact such error could have on voters of color – it is of paramount importance that this data be released to the public to ensure that all of Georgia's eligible voters remain so.

IV.     **The records requested fall well within the public disclosure provisions of §20507(i).**

There is substantial legal precedent to support our request for the production of the above-listed documents.

In *Project Vote/Vote for Am. Inc. v. Long* 682 F.3d 331 (4th Cir. 2012), Project Vote requested records related to completed voter registration applications. In seeking to shield disclosure of the requested documents, Virginia election officials argued that the "'programs and activities' referred to in Section 8(i)(1) of the NVRA are programs and activities related to the purging of voters from the list of registered voters." *Id.* at 335. The 4th Circuit Court disagreed, holding that "the plain language of Section 8(i)(1) does not allow us to treat its disclosure requirement as limited to voter removal records." *Id.* Given that the records we seek *are,* in fact, voter removal records, the *Long* decision supports our claim that such information falls well within Section §20507(i)(1). The *Long* Court further emphasized the broad reach of Section 8(i)(1), noting,

"'(T)he fact that [Section 8(i)(1)] very clearly requires that '*all* records be disclosed brings voter registration application materials within its reach.' *Id.* at 707-08 (emphasis added) (citing *Project Vote* 752 F. Supp. 2d at 706). As this court has recognized, 'the use of the word 'all' is a term of great breadth.' *Nat'l Coal. For Students with Disabilities Educ. & Legal Def. Fund v. Allen,* 152 F. 3rd. 283, 290 (4th Cir. 1998)." *Id.* at 336.

The Mississippi Southern District Court has also upheld the inclusion of full voter roll lists within Section 8(i)(1) in its ruling in *True the Vote v. Hosemann,* 43 Supp. 3d 693 (S.D. Miss. 2014) . "Plaintiffs seek access to an unredacted copy of the Counties' voter rolls (collectively, the 'Voter Roll'). In Mississippi, the Voter Roll is 'a complete list of all Mississippi voters in all status categories': active, inactive, pending, purged, and rejected." *Id.* at 723. There was no controversy between parties as to the disclosure of the Voting Roll, and the Court noted that it "likewise concludes that the Voter Roll is a 'record' and is the 'official list[] of eligible voters' under the NVRA Public Disclosure Provision." *Id.*

In *Project Vote, Inc. v. Kemp,* the Georgia Northern District Court reiterated the importance of providing records showing the full *results* of the programs described in §20507(i)(1) (e.g. lists of those purged or moved to inactive status), not simply records describing the programs themselves: "Limiting the disclosure requirement to a set of general process implementation records without the production of records to show the results of the processes and activities put into place would hinder the public's ability to 'protect the integrity of the electoral process' and to ensure voting regulation programs and activities are implemented in a way that accomplishes the purposes of the statute and are not executed in a manner that is 'discriminatory and unfair.'" *Project Vote, Inc. v. Kemp*, 208 Supp. 3d 1320 (N.D. Ga 2016) at 1340.

It is clear that the NVRA requires the public disclosure of the information that we have requested regarding Crosscheck lists and those individuals who have been purged.

### V.     The state is the ultimate authority in enforcing the NVRA.

It is the state's responsibility to maintain the lists regardless of whether counties might do the legwork to purge the lists or deactivate voters. See e.g. *United States v Louisiana* 196 F. Supp. 3d 612 (M.D. La 2016), where the Court stated: "Naturally read, the NVRA pegs LA as the entity responsible for its overall enforcement and compliance, assigning it ultimate liability even as it requires that one official be selected as the state's administrator, as the Governor's statement underscores." *Id.* at 639.

In *Harkless v. Brunner*, 545 F. 3d 445 (6th Cir. 2008), the Court stated: "However, the entire Act, including other subsections, speaks in terms of state responsibilities; what is noticeably missing is any mention of county, municipal, or other local authorities. Indeed, Congress grafted

the NVRA onto the existing public assistance structure, under which the fifty states, *not their political subdivisions*, have the ultimate accountability." *Id.* at 452 (emphasis added).

As Secretary of State, you are the ultimate authority in the State of Georgia for enforcing the NVRA, per O.C.G.A. §21-2-210, and it therefore your responsibility to ensure the provision of records pursuant to its requirements.

## VI.    Remedy

The records I have requested are subject to disclosure by the provisions of the NVRA. Georgia is currently in violation of federal law by failing to provide the requested records. On behalf of Helen Butler, Executive Director of the Georgia Coalition of the People's Agenda, and Greg Palast, a reporter covering voter suppression issues with Rolling Stone Magazine, Trouthout.com, and the Palast Investigative Fund, I pray you use your authority as the chief elections official for the State of Georgia to provide these records as soon as possible and maintain Georgia's compliance with the NVRA.

The date of this letter marks the beginning of the 90-day window to remedy the error, pursuant to 52 U.S.C. §20510(b)(2), after which an aggrieved individual may bring a civil suit in the appropriate district court for relief. I sincerely hope this letter encourages you to use your authority to bring Georgia into compliance with the NVRA before that time, but if not I will be forced to pursue legal action to rectify this harm.

I look forward to hearing from your office soon regarding a plan of action to amend these violations.

Sincerely,

*Jeanne Mirer*

**Jeanne Mirer**

Mirer Mazzocchi & Julien PLLC
150 Broadway, Suite 1200
212-231-2235
jmirer@mmsjlaw.com


CC: Helen Butler

    Greg Palast

# Exhibit E



# The Office of Secretary of State

*Brian P. Kemp*
SECRETARY OF STATE

2 Martin Luther King Jr., Drive, SE
802 West Tower
Atlanta, Georgia 30334

*Kevin Rayburn*
DEPUTY GENERAL COUNSEL
404-654-6004

September 5, 2018

**USPS CERTIFIED MAIL**
Ms. Jeanne Mirer
Mirer Mazzocchi & Julien PLLC
150 Broadway
STE 1200
New York, NY 10038

<u>RE: Letter Dated June 12, 2018</u>

Dear Ms. Mirer,

I am in receipt of your letter dated June 12, 2018 whereby you request records from our office. This letter is in response to your June 12, 2018 letter, and I have also responded by email.

In regards to the first item you requested in your letter (Interstate Crosscheck Program), we do not have responsive records. Georgia has not used data or matches received from the Interstate Crosscheck Program to remove or otherwise change the status of voter registrations. To date, our involvement has been limited to including our data in the Interstate Crosscheck Program. We did not participate at all this year (2018).

In regards to the second item you requested in your letter (inactive and cancelled lists for 2016 and 2017), please find responsive records at the following link: https://sendsecure.sos.ga.gov/index.php/s/8Dk6qXZR4pOFQ3f

The password to access the file with the responsive records is: GArecords2018@

Also, our office previously responded to your original Georgia Open Records Act request. An email was sent on March 8, 2018 at 7:02 PM with a response letter attached from email account openrecords@sos.ga.gov to jmirer@mmsjlaw.com.

Please let me know if you have any difficulty accessing the responsive records.

Sincerely,

Kevin Rayburn
Assistant Director and Deputy General Counsel
State Elections Division
Georgia Secretary of State's Office

# Exhibit F

# MIRER MAZZOCCHI & JULIEN PLLC

ATTORNEYS AT LAW
150 BROADWAY, TWELFTH FLOOR
NEW YORK, NEW YORK 10038

JEANNE MIRER        KRISTINA MAZZOCCHI        RIA JULIEN

TELEPHONE: (212) 231-2235
FACSIMILE: (212) 409-8338

EMAIL: info@mmsjlaw.com
INTERNET: www.mmsjlaw.com

September 27, 2018

Mr. Kevin Rayburn
Assistant elections director
Deputy General Counsel
Georgia Secretary of State
2 MLK Jr. Drive
Suite 802 Floyd West Tower
Atlanta, Georgia 30334
krayburn@sos.ga.gov

Dear Mr. Rayburn,

Thank you for your response to my records request. I appreciate the information you provided. However, I am still seeking access to the 2016 and 2017 lists provided by the Crosscheck program to your offices, regardless of the purpose for which they were used once received. §20507(i)(1) mandates, in part, that states produce "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." The Interstate Voter Registration Crosscheck program, implemented by your Secretary of State in 2005, is one such program used by your State to accomplish the goal of ensuring the accuracy and currency of your voter rolls, and as such it falls squarely within the definition of §20507(i)(1). Regardless of the processes for Crosscheck data utilized by Georgia elections officials once the lists are received, such lists fall squarely within this definition, and as such you are required to provide them.

Regarding the lists of inactivated and purged voters: these have been provided to us without middle names/first letter of middle names, nor with suffixes (Sr./Jr./III, etc.). Please explain why this information was not provided, and produce an updated list with this information included.

Finally, I am also requesting the below-styled information, to which we are entitled under §20507(i):

1)       Lists of names and addresses of all voters sent confirmation notices in 2016 and 2017;

2)      Information concerning whether each such person has responded to the notice as of this date;

3)      An example of the confirmation notice sent to Georgia voters.
Please provide this information in an electronically-readable format, such as Excel.

Thank you for your assistance, Mr. Rayburn. Please do not hesitate to contact my office if you have any questions regarding this request.

Sincerely,

Jeanne Mirer

CC: Greg Palast, Helen Butler

# Exhibit G



# The Office of Secretary of State

Brian P. Kemp
SECRETARY OF STATE

C. Ryan Germany
GENERAL COUNSEL

October 4, 2018

**<u>Via Electronic Mail</u>**

Jeanne Mirer
Mirer Mazzocchi & Julien PLLC
150 Broadway, Twelfth Floor
New York, New York 10038
*jmirer@mmsjlaw.com*

Re:     Request for Records

Dear Ms. Mirer,

This letter is in your response to your letter of September 27, 2018. In that letter you make a new request for three items pursuant to the NVRA. We have responsive documents to those requests (a list of all voters sent confirmation notices in 2016 and 2017, information as to whether those voters responded to the confirmation notice, and a sample confirmation notice) and should be able to provide you with that information in approximately one week.

You also request that we add middle names and suffixes to the reports we provided regarding inactive and cancelled voters. The existing reports do not have middle names or suffixes, thus we do not have any additional information to provide.

Finally, you again request the lists provided by Crosscheck in 2016 and 2017. We do not have those lists. As stated in the attached Request for Preclearance Submission to the U.S. Department of Justice in 2013, Georgia's participation in Crosscheck has always been limited to providing our information to the program for comparison purposes for other states. We do not use and have not ever used Crosscheck data for list maintenance or any voter registration purpose whatsoever. As of November 2017, Georgia no longer provides voter information to Crosscheck.

Because Georgia does not use and has not ever used Crosscheck data for list maintenance or any voter registration purpose whatsoever, we are under no obligation to retain that data pursuant to the NVRA provisions that you cite. That data from Crosscheck contained personal identifying information, and because we do not want to retain PII that we do not need, we do not retain

Crosscheck data. We have performed a diligent search to ensure that we do not have the 2016 and 2017 lists provided by the Crosscheck program, and we do not have them.

Please feel free to reach out to me directly if you would like to discuss this matter further.

Sincerely,

Ryan Germany

Enclosure

# Exhibit H

# MIRER MAZZOCCHI & JULIEN, PLLC

ATTORNEYS AT LAW
150 BROADWAY, TWELFTH FLOOR
NEW YORK, NEW YORK 10038

JEANNE MIRER
KRISTINA MAZZOCCHI

TELEPHONE: (212) 231-2235
FACSIMILE: (646) 219-0946

RIA JULIEN

October 8, 2018

Mr. Ryan Germany
Office of the Secretary of State
214 Capitol
Atlanta, Georgia 30334
rgermany@sos.ga.gov

Dear Mr. Germany:

This letter is in reponse to your letter of October 4, 2018. I am looking forward to receiving the list of people to whom confirmation notices were sent in 2016 and 2017. I hope I will have that list by tomorrow or Wednesday.

Also as you know Greg Palast has posted on his website the list of people who have been purged in Georgia, in particular those who have been purged for failure to vote in two general elections and has publicized this site so people whose registrations were cancelled can take steps to protect their right to vote. The site has been getting siginificant traffic.

In reponse to your claim that you do not have the 2016 or 2017 Crosscheck lists and that Georgia has never used Crosscheck for list maintenance or any voter registration purpose whatsoever, we have to disagree. We have information that contradicts this assertion. To the extent you claim you have searched and cannot find these lists, we suggest that you request those lists back from Mr. Kobach in Kansas to provide them to us as our information is not complete without the confirmation notices as well as the Crosscheck lists. Without complete information Georgia is subject to a suit for this information.

Also, we have significant evidence that the vast majority of people who have been purged for change of residence still live at the address they had when they registered. We request that you do what we did and verify the addresses of those who are purged and put those who have not changed their residence back on the voter rolls without having to re-register. The right to vote is a fundamental right which should not be taken away from any citizen without the strictest of measures to ensure people are not disenfranchised if they have not changed their residences.

Sincerely,

Jeanne Mirer

Cc: Greg Palast, Helen Butler