IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| GREG PALAST and HELEN BUTLER, | ) ) ) | |
| Plaintiffs, | ) ) ) | CIVIL ACTION FILE |
| v. | ) ) ) | NO. 1:18-CV-04809-ELR |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia, | ) ) ) ) ) | |
| Defendant. | ) | |

## DEFENDANT'S AMENDED MOTION TO RECONSIDER SUMMARY JUDGMENT IN FAVOR OF DEFENDANT[1]

COMES NOW, Brad Raffensperger, in his official capacity as Secretary of State of the State of Georgia ("Defendant" or "Secretary"), by and through counsel, and respectfully files this Amended Response in Opposition to The Court's *Sua Sponte* Consideration of Summary Judgment in Favor of Plaintiffs, showing the Court as follows:

---

[1] On March 5, 2020, Defendant timely filed its Response in Opposition to the Court's *Sua Sponte* Consideration of Summary Judgment in Favor of Plaintiffs and Motion to Reconsider Summary Judgment in Favor of Defendant. [Doc. 26.] Out of an abundance of caution, Defendant now files this Amended Motion to separately request reconsideration of the Court's Order denying summary judgment in favor of Defendant [Doc. 25]. No other changes have been made to this document.

# INTRODUCTION[2]

In its February 4, 2020 Order ("Order"), the Court denied Defendant's Motion for Summary Judgment, and is "now consider[ing] entering summary judgment in favor of Plaintiffs *sua sponte* pursuant to Federal Rule of Civil Procedure 56(f)." [Doc. 25 at 10.] The Court's Order directs the State to respond to its *sua sponte* summary judgment consideration. [Id.] When viewing the evidence in the light most favorable to Defendant as the non-moving party, as is the standard, there is no basis for granting summary judgment in favor of Plaintiffs. The Court has already held in its Order that a material issue of disputed fact exists as to the central issue in this case, which precludes summary judgment for Plaintiffs. Moreover, as responding to the Court's Order requires Defendant to further address and explain its involvement with Kansas's crosscheck process, Defendant is also compelled to take this opportunity to ask the Court to reconsider its Order.

The Court held that while there was no evidence in the record that Defendant had the documents sought by Plaintiffs, "the evidence in the record sufficiently

---

[2] The background facts and applicable law in this case are set forth generally in Defendant's Brief in Support of its Motion for Summary Judgment. [Doc. 17-1.] In the interest of efficiency and clarity, they are incorporated by reference and will not be repeated here.

calls into question whether Georgia utilized the [2016 and 2017 Crosscheck Lists ("Crosscheck Lists")] as a tool to aid in determining or ensuring the 'accuracy and currency of list of eligible voters'[3] as contemplated by the NVRA." [Id. at 7.] While the State has maintained that it did not use the Crosscheck Lists to take any action with respect to the State's voter rolls, the Court found that "the express language of the MOU" suggested otherwise. [Id. at 8.] Thus, the Court concluded that there existed a genuine issue of material fact on this issue and whether Georgia was thereby required to maintain the Crosscheck Lists pursuant to the NVRA.[4] Defendant respectfully asks this Court to reconsider that assessment and, in the alternative, not grant *sua sponte* summary judgment to Plaintiffs for three reasons.

---

[3] The Court's Order quotes the NVRA as requiring the State to maintain documents related to an eligible voter "list." The statute, however, requires the State to only maintain documents regarding the State's "official lists of eligible voters." 52 U.S.C. § 20507(i)(1); see also Project Vote, Inc. v. Kemp, 208 F. Supp. 3d 1320, 1338 (N.D. Ga. 2016) (records to be maintained must relate to actions or programs used to "ensure that the State's official list of individuals entitled to vote is current and accurate.") (emphasis added).

[4] While Plaintiffs raised several other arguments in opposition to Defendant's Motion for Summary Judgment [Doc. 19], the MOU's language was the sole reason that the Court cited in its Order as precluding summary judgment. As such, Defendant understands the Court's Order to have correctly disregarded Plaintiffs' other arguments, which are without merit. To the extent that such is necessary, Plaintiffs' other arguments are addressed in Defendant's Reply in Support of its Motion for Summary Judgment [Doc. 20], which is incorporated by reference.

First, the MOU does not require Georgia to take any action regarding its own voter rolls.  Most of the language cited by the Court appears in the MOU's prefatory "whereas" clauses, which are nonbinding recitals regarding its general purpose.  In fact, the only action prescribed to the State in the MOU's operative section is that which the State actually did: submit its voter registration data to Kansas to be processed and potentially used by **other states**.  In other words, Georgia agreed only to provide information and not to use the information.  The MOU simply does indicate an intent by Georgia, let alone bind it, to use the Crosscheck Lists as the Court concluded.

Second, regardless of the nonbinding language of the MOU, it is not evidence of any action by the State regarding the Crosscheck Lists.  The MOU was executed several years before the Crosscheck Lists even came into existence.  The MOU has no bearing on what actually occurred in 2016 and 2017 with respect to the Crosscheck Lists, which determines whether or not the State would be required to maintain them under the NVRA.  The only evidence in the record regarding this issue comes from the Declaration of the Secretary of State's executive counsel, Ryan Germany, who testified unequivocally that the State did not use the Crosscheck Lists for any purpose whatsoever.  This evidence remains undisputed and is the only record evidence on the issue.

Finally, the Court concluded in its Order that the terms of the MOU conflicted with Georgia's VRA Section 5 preclearance letter sent to the U.S. Department of Justice ("Preclearance Letter") [Doc. 17-3 at 9.] and the Declaration of Mr. Germany [Doc. 17-3].  Both the Preclearance Letter and Mr. Germany's Declaration confirm that the State would not, and did not, use the Crosscheck Lists to perform maintenance on its own voter rolls.  Accordingly, even if the MOU has the import assigned to it by the Court, there is **at the very least** competing evidence as to the question of whether Georgia took any action regarding the Crosscheck Lists and was thus required to maintain them under the NVRA.  Such precludes Summary Judgment in Plaintiffs' favor.

For these reasons, and as discussed in further detail herein, Defendant respectfully requests that the Court reconsider its Order and grant summary judgment in Defendant's favor.  In the alternative, because the Court has already concluded that at the very least there is competing evidence and a genuine issue of material fact as to whether Georgia used the Crosscheck Lists, summary judgment in Plaintiffs' favor must be denied.

# ARGUMENT AND CITATION TO AUTHORITY

## I.  Standard of Review

"The standard for a *sua sponte* grant of summary judgment is the same as the standard for a grant of summary judgment on a motion by the parties: the Court must determine whether there are any outstanding issues of material fact that create a genuine issue for trial." Addison Ins. Co. v. 4000 Island Blvd. Condo. Ass'n, Inc., 263 F. Supp. 3d 1266, 1272 (S.D. Fla. 2016), aff'd, 721 F. App'x 847 (11th Cir. 2017).  When considering the grant of summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the opposing party. Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc., 496 F.3d 1231, 1241 (11th Cir. 2007).  The Court also must "'resolve all reasonable doubts about the facts in favor of the non-movant.'" Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1274 (11th Cir. 2008) (quoting United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am., 894 F.2d 1555, 1558 (11th Cir. 1990)).

## II.  The NVRA's Document Maintenance Requirement and The Project Vote Decision

The NVRA does not require a State to maintain **all** election-related documents.  Section 8(i) of the NVRA only requires States to maintain documents that bear some relation to action(s) taken by the State that affect or could affect its list of eligible voters.  Specifically, the NVRA requires the State to "maintain for at

least 2 years and [ ] make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities <u>conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters</u> . . . ." 52 U.S.C. § 20507(i)(1) (emphasis added). This Court recognized this limitation in <u>Project Vote v. Kemp</u>: the NVRA only requires the State to maintain records that "relate to <u>fulfilling, performing, carrying out, or putting into effect</u> by means of a definite plan or procedure (1) systems or (2) specific actions <u>to ensure that the State's official list of individuals entitled to vote is current and accurate</u>." 208 F. Supp. 3d 1320, 1338 (N.D. Ga. 2016) (emphasis added).

The Court also cites the <u>Project Vote</u> decision as support for a "broad interpretation of the documents required to be disclosed under the notice provisions of the NVRA." [Doc. 25 at 9.] Even accounting for a broad interpretation of the statute, however, there is a critical distinction between the documents sought in <u>Project Vote</u> and those at issue here. Namely, the individual voter registration applications sought by the Plaintiffs in <u>Project Vote</u> related to a "process of reviewing and determining the eligibility of voter registration applications . . . carried out in service of a specified end—maintenance of the voter rolls." <u>Id</u>. Put

simply, if the application was approved or denied, the applicant would or would not, respectively, appear on the State's list of eligible voters.

The point is further demonstrated when comparing the individual voter registrations sought in Project Vote to the absentee ballot applications and envelopes sought in True the Vote v. Hosemann, 43 F. Supp. 3d 693, 727 (S.D. Miss. 2014). In Hosemann, the Court found that the absentee ballot applications and envelopes did not fall within the NVRA's preservation scope because they "neither concern voter registration nor are records concerning a program or activity to ensure the accuracy and currency of the voter roll" and that "there is no evidence that these applications are used to update or maintain the voter roll." Id.

Here, the Crosscheck Lists were never used by Georgia to perform voter list maintenance or, in fact, for any other purpose. See infra Section III. Thus, like the absentee ballot applications and envelopes in Hosemann, the Crosscheck Lists are unrelated to any program or action by the State affecting its official list of eligible voters and are not required to be maintained or disclosed pursuant to the NVRA. 52 U.S.C. § 20507(i)(1).

### III. The MOU Does Not Impose Obligations On The State To Use The Crosscheck Lists And Is Not Evidence Of The State Doing So

Respectfully, Defendant asks the Court to reconsider its denial of summary judgment against Defendant for two reasons: (1) the MOU does not require

Georgia to take any action regarding its own voter rolls; and (2) regardless of its language, the MOU has no evidentiary bearing on what actually occurred in 2016 and 2017 when the Crosscheck Lists were created.

    A.    *The MOU does not require Georgia to take any action regarding its own voter rolls.*

In its Order, the Court identified the following provisions of the MOU as the "pertinent part" and an "express agreement" that Georgia would use the Crosscheck Lists to remove individuals from its voter rolls:

> Whereas the existence of centralized, interactive, computerized statewide voter registration lists facilitates the interoperability of such lists **for the purpose of comparison and cross checking registration records**, and; whereas the chief state election officials of the representative [s]tates desire to enter into this Memorandum . . . **to establish between them and between the [s]tates a process for each [s]tate to improve the accuracy of each [s]tate's voter registration list**; [n]ow therefore, the undersigned chief state election officials, in exchange for the mutual promises and commitments contained in this Memorandum of understanding, do hereby agree as follows: **the [s]tates agree to share voter registration information for the purposes of cross checking and identifying duplicate registrations and instances of multiple votes by the same individuals.**

[Doc. 25 at 8 (emphasis in original).] This language, however, does not mandate any act by the State, nor does it demonstrate state action.

First, the majority of the quoted language above appears in the MOU's prefatory "whereas" clauses, which are merely recitals about its general purpose. Language in the preamble of a multi-state MOU is hardly evidence that the

Secretary is obligated to conduct a program or activity in Georgia using the Crosscheck Lists to ensure accuracy and currency of Georgia's official list of eligible voters. Cf. Hawaii v. Office of Hawaiian Affairs, 556 U.S. 163, 175 (2009) ("'[W]here the text of a clause itself indicates that it does not have operative effect, such as 'whereas' clauses . . . a court has no license to make it do what it was not designed to do.'") (quoting District of Columbia v. Heller, 554 U.S. 570, 578, n. 3 (2008).  Accordingly, these clauses, regardless of their language, do not indicate that Georgia would perform, let alone obligate it to perform, any act with regard to its voter rolls. Cf. Whetstone Candy Co. v. Kraft Foods, Inc., 351 F.3d 1067, 1074 (11th Cir. 2003) ("'[W]hereas' clauses are not binding when the contract is otherwise unambiguous. They are merely prefatory recitations of the facts that lead the parties to enter the agreement.") (citation omitted).  Put simply, this language has no operative effect.

Second, the lone provision cited from the MOU's operative section also does not indicate that Georgia intended to undertake any action regarding its own voter rolls.  By its plain language, Paragraph 1 of the MOU merely expresses Georgia's agreement "to share [its] voter registration information" to be used for the development of the Crosscheck Lists.  This process is further detailed in Paragraph 2 of the MOU, which states that "[e]ach state will send a file containing voter

registration data to the Kansas Secretary of State's office in a format and on a schedule to be determined by mutual agreement, with the intention of conducting a cross check at minimum once per year." [Doc. 17-3 at 15.] The conducting of the "cross check" and the remainder of the steps are all performed by the Kansas Secretary of State. <u>Id</u>. By the clear language of the MOU, Georgia did not (nor did any other state) agree to do anything beyond submit information to Kansas.[5] <u>Id</u>.

The United States Department of Justice shared this understanding, which should not be discounted. Unlike the MOU, the Preclearance Letter specifically addressed the Secretary's intent regarding the Crosscheck Lists:

> The submission is made out of an abundance of caution, but the **providing of this data to other states will not affect Georgia's voter registration system or its voters in any way**.
>
> […]
>
> Georgia is **not using the information provided by the Kansas Secretary of State to either challenge or remove registrations** and the data will not be provided to county voter registrars. The sole purpose of Georgia's participation in the program is to increase the universe of registrant's names in the database for comparison purposes by the other states. Those states may then determine whether they need to undertake any registration actions.
>
> […]

---

[5] Even at this step, Georgia's participation was at all times voluntary and at the discretion of the Secretary. In fact, Georgia has not even submitted its voter registration data to Kansas since January 2017. [Doc. 17-3 at 1.]

> As noted above, the Memorandum of Understanding provides for Georgia to provide registration information to the Kansas Secretary of State for data comparison purposes and possibly for use by other states in relation to registrations. **Georgia is not taking any action in relation to Georgia's registered voters in relation to the Memorandum.**

[Doc. 17-3 at 10, 12 (emphasis added).] The Justice Department: (1) did not raise any concern that Georgia would be required to remove individuals from its rolls or take any other action by signing the MOU; (2) accepted that Georgia could, under the terms of the MOU, limits its involvement to merely submitting its voter registration data to Kansas; and (3) found that no preclearance was required because the process described by the State "**does not affect voting**" in Georgia. [Doc. 17-3 at 18 (emphasis added).] In short, the Justice Department understood that the MOU allowed Georgia to do precisely what it said it was going to do with the Crosscheck Lists that Kansas produced: nothing.

> B.   *The MOU is not evidence of what Georgia did with the Crosscheck Lists.*

Even if the MOU expressed that Georgia intended, or arguably was supposed to, use the Crosscheck Lists for voter list maintenance—which it does not—it is still not evidence of what actually occurred, and only action (not disputed intent) is a basis for maintaining documents under the NVRA.

The MOU was executed in 2013; years before the Crosscheck Lists even came into existence. [Doc. 17-3 at 15.]  Thus, it is not evidence of, and has no bearing on, whether or not Georgia used the Crosscheck lists in any fashion, or in a manner that would require Georgia to maintain and produce the documents pursuant to the NVRA.

The only evidence in the record regarding Georgia's actual use of the Crosscheck Lists comes in the Declaration of Ryan Germany, who stated explicitly: "Georgia **does not use and has never used** the information generated by the Kansas Secretary of State to challenge or remove registrations from the Georgia voter registration database or for any list maintenance purpose whatsoever, including sending confirmation notices." [Doc. 17-3 at 1 (emphasis added).][6] As such, the testimony of Ryan Germany is undisputed, which supports summary judgment being issued for Defendant.

---

[6] As a reminder, Plaintiffs failed to conduct any discovery in this case, and unverified allegations in the Complaint and unfounded arguments and speculation by Plaintiffs are insufficient to defeat summary judgment. See Crowley v. Guarded WiFi, LLC, 2015 WL 11216736, at *1 (N.D. Ga. Mar. 26, 2015) (Ross, J.) ("[T]he Complaint was not verified and cannot properly be considered as evidence at the summary judgment stage."); Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) ("[U]nsupported speculation . . . does not meet a party's burden of producing some defense to a summary judgment motion.  Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (quotation omitted).

See Horace Mann Ins. Co. v. McGee, 840 F. Supp. 875, 877 (M.D. Ala. 1994) (summary judgment is proper where "the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof.") (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

**IV. Alternatively, Summary Judgment in Plaintiffs' Favor is Inappropriate Because a Genuine Issue of Material Fact Remains Regarding Georgia's Alleged Use of The Crosscheck Lists**

Should the Court not revisit its Order, summary judgment in Plaintiffs' favor should likewise be denied. Given the Court's finding of a dispute of material fact, summary judgment cannot be granted in favor of Plaintiffs. As discussed above, the determinative issue in this case is whether the Crosscheck Lists relate to any action taken by the State regarding its voter rolls. The Court already held explicitly in its Order that there was "sufficient evidence in the record that would cast a genuine dispute as to the material facts on this issue." [Doc. 25 at 7.] For this reason alone, summary judgment in favor of Plaintiffs is inappropriate.

Even if the MOU offered evidentiary support for Plaintiffs' theory that the Crosscheck Lists were used by Georgia to conduct maintenance on its voter rolls, which it does not, the Court acknowledged in its Order that such

is contradicted by both the Preclearance Letter and the Declaration of Ryan Germany. [Doc. 25 at 8.]  This is dispositive and warrants strongly against granting summary judgment. "It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996).  Thus, concerns about whether evidence is "unpersuasive" [Doc. 25 at 8], are not a basis to grant or deny summary judgment. See Miller v. Harget, 458 F.3d 1251, 1255–56 (11th Cir. 2006) ("Even if the district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.").

For these reasons, at the very least and as the Court has already acknowledged, a genuine dispute of material fact exists in this case as to the critical and determinative issue in this case: whether Georgia used the Crosscheck Lists for any purpose relating to its voter rolls. Accordingly, summary judgment in favor of Plaintiffs must be denied.

## CONCLUSION

For the reasons stated herein, Defendant respectfully requests that the Court reconsider its prior Order and grant Defendant's Motion for Summary Judgment.

In the alternative, summary judgment in favor of Plaintiffs should, at the very least, be denied.

Respectfully submitted this 6th day of March, 2019.

>  */s/ Josh Belinfante*
> Josh Belinfante
> Georgia Bar No. 047399
> jbelinfante@robbinsfirm.com
> Vincent R. Russo
> Georgia Bar No. 242628
> vrusso@robbinsfirm.com
> Brian E. Lake
> Georgia Bar No. 575966
> blake@robbinsfirm.com
> Robbins Ross Alloy Belinfante Littlefield LLC
> 500 14th Street, N.W.
> Atlanta, GA 30318
> Telephone:  (678) 701-9381
> Facsimile:   (404) 856-3250
>
> *Counsel for Defendant*

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief has been prepared in a Times New Roman 14-point font, one of the font and point selections approved by the Court in Local Rule 5.1(C).

Respectfully submitted this 6th day of March, 2020.

>   */s/ Josh Belinfante*
>   Josh Belinfante
>   Georgia Bar No. 047399
>   jbelinfante@robbinsfirm.com
>   Vincent R. Russo
>   Georgia Bar No. 242628
>   vrusso@robbinsfirm.com
>   Brian E. Lake
>   Georgia Bar No. 575966
>   blake@robbinsfirm.com
>   Robbins Ross Alloy Belinfante Littlefield LLC
>   500 14th Street, N.W.
>   Atlanta, GA 30318
>   Telephone:  (678) 701-9381
>   Facsimile:   (404) 856-3250
>
>   *Counsel for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day filed the within and foregoing **DEFENDANT'S AMENDED MOTION TO RECONSIDER SUMMARY JUDGMENT IN FAVOR OF DEFENDANT** with the Clerk of Court using the CM/ECF electronic filing system which will automatically send counsel of record e-mail notification of such filing.

>G. Brian Spears
>1126 Ponce de Leon Avenue
>Atlanta, Georgia 30306
>bspears@mindspring.com
>
>Jeanne Mirer
>Mirer, Mazzocchi & Julien PLLC
>150 Broadway, 12th Floor
>New York, New York 10038

This 6th day of March, 2020.

>*/s/ Josh Belinfante*
>Josh Belinfante